Submitted February 6; resubmitted en banc June 17, reversed and remanded
August 26, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# GERALD WAYNE PRIMEAUX,
*Defendant-Appellant.*

Marion County Circuit Court
06C49868; A134910

216 P3d 887

Garrett A. Richardson and Multnomah Defenders, Inc., filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Jamie K. Contreras, Assistant Attorney General, filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

SERCOMBE, J.

Edmonds, J., concurring in part, dissenting in part.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction for delivery of a Schedule I controlled substance, ORS 475.840(1). Defendant contends that the trial court erred in denying his motion to suppress evidence and in convicting him on the basis of an insufficiently corroborated confession. We conclude that the evidence was sufficient to convict defendant. We review the denial of defendant's motion to suppress for legal error, *State v. Sopiwnik*, 176 Or App 127, 129, 30 P3d 430 (2001), and determine that the court erred in denying the motion to suppress evidence. Accordingly, we reverse and remand.

The following facts are uncontroverted. A City of Aurora police officer observed an automobile driven by defendant with a missing brake light cover such that the radiated light was white in color. Oregon law requires that an automobile display a red rear brake light. The officer activated his patrol car's overhead lights to initiate a traffic stop. While he followed the automobile, defendant tossed a beer can out of the driver's window. The officer stopped the automobile and interviewed defendant. Defendant admitted that he had thrown the can of beer out the window, explaining that he "didn't want to get into trouble." Defendant also stated that he had consumed two beers. The officer asked defendant to get out of the vehicle and to produce identification. Although the officer could detect a slight odor of alcohol on defendant's breath, the officer determined that defendant was not intoxicated based on an examination of his eyes. The officer returned defendant's driver's license, warned him about driving with an open alcoholic beverage container and littering, and reminded him to get his brake light repaired.

The officer testified to what happened next:

"He [defendant]—said he understood, and he still just stood there. And he seemed kind of nervous. His hands were shaking. He kept looking back and forth. At that point, I asked him if there [were] any drugs or weapons in the car. [Defendant] said, 'I'm just going to a party for my son.' And I asked him if a drug dog were to walk around the vehicle, if it would detect anything. And [defendant] said, 'I have an ounce of marijuana in my car.' "

The officer testified that he had asked defendant where the marijuana was in the car and that defendant had told him that it was in his backpack. The officer then placed defendant in handcuffs, entered the car, and seized the backpack. The officer could smell the odor of marijuana emanating from the backpack, and, after opening its larger compartment, he found the marijuana that led to defendant's conviction.

In his second assignment of error, defendant argues that the trial court erred by not granting his motion for a judgment of acquittal on the ground that the evidence adduced at trial was not sufficient to convict him under ORS 136.425(1).[1] That statute provides:

> "A confession or admission of a defendant, whether in the course of judicial proceedings or otherwise, cannot be given in evidence against the defendant when it was made under the influence of fear produced by threats; nor is a confession only sufficient to warrant the conviction of the defendant without some other proof that the crime has been committed."

Defendant told the officer that he was delivering marijuana to a party for his son. In substance, defendant contends that his confession is the only evidence of his intent to deliver the marijuana found in his possession and that, therefore, the trial court was required to grant his motion under ORS 136.425(1).

In reviewing defendant's claim of error, we consider the record and all reasonable inferences that could be drawn from it in the light most favorable to the state to determine whether a reasonable juror could have found all the elements of the offense beyond a reasonable doubt. *State v. Cunningham,* 320 Or 47, 63, 880 P2d 431 (1994), *cert den,* 514 US 1005 (1995). In *State v. Lerch,* 296 Or 377, 677 P2d 678 (1984), the court held that ORS 136.425(1) does not require the state to corroborate each and every element of an offense to which a defendant has confessed. Rather, the statute

---

[1] Because defendant would be entitled to more complete relief—an acquittal, rather than a remand—if successful on his second assignment of error, we address that assignment of error first. *State v. Lavadores,* 230 Or App 163, 165 n 2, 214 P3d 86 (2009).

"requires evidence that *tends* to prove or establish the corpus delicti. * * *

"* * * * *

"We hold that 'some proof' means that there is enough evidence from which the jury may draw an inference that tends to establish or prove that a crime has been committed."

296 Or at 397-98 (emphasis in original).

Here, the officer discovered two baggies of marijuana in defendant's backpack. One baggie contained 4.8 grams of marijuana; the other baggie's contents weighed 34.3 grams. The baggies were packaged separately, one in a baggie inside another container and the other in a baggie by itself. Focusing on that evidence, the state argues, and we agree, that a reasonable inference that could be drawn from the evidence is that the smaller amount of marijuana was for personal consumption and that the larger amount was for the purpose of delivery to other persons. *See State v. Rodriguez-Barrera*, 213 Or App 56, 60, 159 P3d 1201, *rev den*, 343 Or 224 (2007) ("[P]ossession of a controlled substance in a quantity that is inconsistent with personal use, when accompanied by possession of materials commonly associated with delivery, is sufficient to establish possession with intent to deliver the controlled substance."); *see also State v. Alvarez-Garcia*, 212 Or App 663, 159 P3d 357 (2007). Thus, there is some evidence that tends to corroborate defendant's admission that he was delivering the marijuana to his son at a party. It follows that the trial court did not err in denying defendant's motion for judgment of acquittal.

■ Defendant next asserts that the trial court erred in denying his motion to suppress the evidence of marijuana and his statements to the police officer following the questions about drugs and weapons. Defendant contends that the evidence was obtained as a result of a violation of Article I, section 9, of the Oregon Constitution.[2] Defendant argues that the state acquired the evidence by unlawfully extending the

---

[2] Article I, section 9, provides that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

traffic stop or, alternatively, stopping him for a second time by questioning him about drugs and what a drug dog would find. The stop extension or second stop occurred, according to defendant, without any reasonable suspicion that he had committed a crime. The state counters that the officer's statements made it clear that the traffic stop had ended and that defendant was free to leave before the questions were asked. Moreover, it asserts that the officer's questions about drugs or weapons and a drug dog did not constitute a second restraint on defendant's freedom of movement under Article I, section 9, because the questions did not manifest an exercise of the officer's authority.

We conclude that Article I, section 9, was violated when defendant was questioned during a traffic stop about matters unrelated to the stop, thereby prolonging the stop without reasonable suspicion of further criminal activity. As a result of that unlawful questioning, defendant's backpack was confiscated and searched. That search and the unlawful inquiries yielded the evidence sought to be suppressed. Under *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005), that evidence should have been suppressed because its discovery was not otherwise inevitable or sufficiently attenuated from the unlawful police conduct.

The legal analysis is straightforward. Article I, section 9, precludes an "unreasonable search, or seizure." We summarized the circumstances that create an unreasonable traffic stop in *State v. Rodgers*, 219 Or App 366, 370-71, 182 P3d 209, *rev allowed*, 345 Or 301 (2008):

> "To be reasonable, traffic stops must be supported by reasonable suspicion that the person stopped has committed a traffic infraction. If reasonable suspicion of a traffic infraction exists, '[a]n officer can lawfully detain a driver * * * for "the time reasonably required to complete a citation and any other documents that must be given to the citizen in connection with the detention." ' *During* a lawful traffic stop, an officer may, without violating Article I, section 9, question the motorist about matters that are unrelated to the stop. Questioning that occurs during, or causes an *extension* of the traffic stop beyond that reasonable time, however, is the functional equivalent of a new restraint of the motorist's liberty, and must be supported by reasonable

suspicion that the motorist has engaged in some further criminal activity. * * *

"Inquiries unrelated to the initial traffic infraction can lead to unlawful restraint of a person's liberty in two situations. The first occurs when the officer concludes a lawful stop and then reinitiates a second stop by beginning to question the person about unrelated matters without reasonable suspicion. * * *

"The second way in which an officer can unlawfully question a person after a lawful traffic stop occurs when the officer, without letting the person know expressly or by implication that he or she is free to leave, detains the person beyond the time reasonably required to investigate the traffic infraction and issue a citation."

(Emphasis in original; citations omitted.)

The state does not contend, and the record does not suggest, that the police officer reasonably suspected that defendant had committed a crime until his admission of marijuana possession. Under the *Rodgers* framework, the questioning of defendant about matters unrelated to the traffic stop before that admission, and after completion of the traffic stop investigation, unconstitutionally restrained his liberty unless (1) the original traffic stop had ended and (2) the renewed questioning did not constitute a new stop. The state had the burden of proof to show both of those circumstances.[3]

The state's first hurdle, then, is to show that the traffic stop had ended before the questioning about drugs, weapons, and the likely result of a dog search. In its findings, the trial court assumed that the traffic stop continued at the time of that questioning, but surmised that the police officer did "not need probable cause or reasonable suspicion to ask a lawfully stopped person for consent to search." The trial court's assumption about the continuation of the stop was correct, although its subsequent conclusion was not.[4]

---

[3] Under ORS 133.693(4), where, as here, "the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution."

[4] After defendant's counsel argued that the evidence should be suppressed under *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), because the stop was prolonged improperly, the trial court noted:

■        In *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), the court held that a person is "seized" for purposes of Article I, section 9, in the following situations:

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a) above, has occurred and such belief is objectively reasonable in the circumstances."

(Footnote omitted.) Whether a person is no longer detained, then, depends on whether the law enforcement officer intentionally ends the restriction on the person's freedom of movement or whether the person reasonably believes that the officer has intentionally ended that restriction.

■        The determination of whether a person has been seized, and whether a seizure has ended, is determined by examination of all of the circumstances of a particular case, and the facts of each case are unique. There may be circumstances where a reasonable person could conclude that an official detention has ended without being told, "You are free to leave." Obviously, if the police officer concludes all inquiries and leaves the area without instructing the detainee to remain there, the detention ends.

Here, however, there was insufficient evidence that the traffic stop had ended before the questioning, under either an objective or subjective test of its expiration. There is no evidence that defendant was told that he was free to leave.

---

"THE COURT:  I was just reviewing *Hall*. I wasn't familiar with *Hall*. So I'm quickly trying to review that. I see that it is distinguishable * * *. *Hall* became an unlawful stop because the officers directed the Defendant to come to them, so he was originally unlawfully stopped, and then it was whether or not there was a exploitation of that illegal stop.

"Here, there was not an illegal stop. And the stop, as conceded, is a valid stop. The officer, then, does not need probable cause or reasonable suspicion to ask a lawfully stopped person for a consent to search.

"* * * So it was not even a request for consent to search, but merely a question about whether or not drugs would be found in the vehicle, and the Defendant admitted there would be.

"So I do deny the Defendant's motion to suppress."

The trial court concluded that, because the inquiries were made to a "lawfully stopped person," the questions were constitutionally appropriate. That legal conclusion was drawn before our decision to the contrary in *Rodgers*.

After the return of defendant's driver's license, the officer warned defendant about the consequences of driving with an open container and littering. He testified that he had continued to watch defendant, who "seemed kind of nervous. [Defendant's] hands were shaking. He kept looking back and forth." The officer did not move to return to his patrol car. He stated that his estimate of the time between the warning and renewed interrogation was a "guess, probably ten to 15 seconds." There was no friendly conversation that preceded the official inquiries. *Cf. State v. Bretches*, 225 Or App 602, 609, 202 P3d 883 (2009) (stop ended when defendant was told he was free to go and ordinary conversation ensued). Defendant apparently did not believe that the inquiry had ended, because he continued to tremble and did not return to his car.

The *only* evidence that the state relies on to prove the ending of the stop is a 10- to 15-second gap in the dialogue between the police officer and defendant between the official warnings about defendant's future conduct and the drug interrogation. In light of the facts stated above and the absence of actions by the police officer communicating that the stop had ended, the time lapse alone is insufficient to discharge the state's burden of proof on this issue. Those facts do not show that the exercise of authority over defendant ended sometime after the warning and before the additional questioning or that defendant reasonably believed that the stop had ended.

The dissent asserts that the officer's warnings and the gap in the conversation were not coercive and did not "manifest[ ] objectively an interference with the person's freedom of movement." 230 Or App at 482-83 (Edmonds, J., dissenting). The initial issue, however, is not whether that evidence shows coercion or would independently prove the existence of a stop, but whether that evidence shows that the stop had ended. The state's proof of a pause in formal communications, during which time the police officer remained in defendant's presence and watched him, is insufficient evidence that defendant "knew expressly or by implication that [he was] free to leave." Thus, the questions unrelated to the traffic stop exceeded the officer's authority under Article I, section 9. Therefore, the evidence was obtained as a result of an unconstitutional deprivation of defendant's liberty, and

the trial court erred in denying defendant's motion to suppress evidence.

Reversed and remanded.

**EDMONDS, J.,** concurring in part, dissenting in part.

I agree with the majority's holding that the trial court did not err in denying defendant's motion for judgment of acquittal. The majority also holds that the traffic stop of defendant had not ended when the officer asked defendant if there were any drugs or weapons in his car and whether, if a "drug dog were to walk around the vehicle, it would detect anything." I disagree with that holding for the reasons expressed below.

In his first assignment of error, defendant argues that the trial court erred in denying his motion to suppress the evidence of marijuana under Article I, section 9, of the Oregon Constitution. In defendant's view, by asking him questions about drugs and what a drug dog would find if it walked around his vehicle, the officer unlawfully extended the traffic stop without any reasonable suspicion that defendant had committed a crime. The state counters that, prior to asking defendant those questions, the officer made statements to defendant that made it clear that the traffic stop had ended and that defendant was free to leave. Moreover, it asserts that the officer's questions about drugs or weapons and a drug dog did not constitute a second restraint on defendant's freedom of movement under Article I, section 9, because the questions did not manifest an exercise of the officer's authority.

Article I, section 9, provides, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"[1] An officer cannot lawfully continue to detain a

---

[1] A "seizure" under Article I, section 9, occurs when a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of the liberty or freedom of movement, or, alternatively, whenever an individual believes that his or her freedom of movement has been interfered with and such a belief is objectively reasonable under the circumstances. *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991).

motorist under Article I, section 9, after a legal traffic stop has ended without reasonable suspicion that the defendant is engaged in some criminal activity. *State v. Toevs*, 327 Or 525, 534-35, 964 P2d 1007 (1998). On the other hand, not every question unrelated to the reason for a traffic stop will constitute a restraint on a person's liberty under Article I, section 9. *State v. Amaya*, 336 Or 616, 626, 89 P3d 1163 (2004). Rather, some encounters between a police officer and a citizen constitute "mere conversation." *Id.* Such noncoercive encounters do not interfere with a person's liberty of movement and therefore do not constitute a "seizure" under Article I, section 9. *Id.* at 627. In contrast to conversational encounters, "[p]olice conduct interfering with a person's liberty of movement may take the form of either physical force or a show of authority." *State v. Hall*, 339 Or 7, 17-18, 115 P3d 908 (2005). Thus, the pivotal consideration in deciding whether police conduct implicates Article I, section 9, is whether "the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991).

Under *Toevs* and *Amaya*, the determination of whether the traffic stop of defendant had ended and reverted to a noncoercive conversational encounter involves both questions of facts and questions of law. Here, in response to defendant's argument that the officer "illegally increas[ed] the length of the stop," the trial court, without making any express factual findings, concluded that there had not been an illegal stop. Under *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1969), "[i]f findings are not made on all [historical] facts, and there is evidence from which such facts could be decided in more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion[.]"

In arriving at its conclusion that the traffic stop of defendant did not end when the officer returned defendant's driver's license to him, the majority posits that the "*only* evidence that the state relies on to prove the ending of the stop is a 10- to 15-second gap in the dialogue between the police officer and defendant between the official warnings about

defendant's future conduct and the drug interrogation." 230 Or App at 478 (emphasis in original). Based on that premise, the majority concludes that "the time lapse alone is insufficient to discharge the state's burden of proof on this issue." *Id.*

With respect, the majority's characterization of the state's argument and the evidentiary record is too narrow. In its brief, the state points to the facts that defendant had successfully completed a field sobriety test after which the officer had returned his identification to him, warned him against littering, and reminded him to get his brake light fixed. Also, the state emphasizes the absence of any exercise of authority by the officer over defendant at any point in time after he returned defendant's driver's license to him. The majority also asserts that defendant appeared to be nervous and concludes that defendant apparently did not believe that the traffic stop had ended "because he continued to tremble and did not return to his car." 230 Or App at 478. However, defendant did not testify at the suppression hearing, and the trial court made no finding as to defendant's subjective belief. Moreover, defendant's nervousness existed before he was asked to take a field sobriety test. The officer testified that, "when I asked * * * him to get out of the car, he seemed to be doing it a little bit more." When asked if his nervousness increased after his driver's license was returned to him, the officer responded, "Not that I recall."

Rather than the narrow view of the record relied on by the majority, the proper determination of whether a person has been "seized" under Article I, section 9, requires a fact-specific inquiry examining the *totality of the circumstances* in a particular case. *Hall*, 339 Or at 18. The following circumstances are not in dispute. The officer activated his overhead lights and then saw a can of beer being thrown out of defendant's car window. When contacted, defendant admitted that he had been drinking beer and there was a slight odor of alcohol on his breath. The officer requested that defendant take some field sobriety tests. Defendant agreed to the request and got out of his car and went with the officer to the back of his car. The officer turned down his overhead lights so that he could examine defendant's eyes and "do an

HGN on him."[2] The officer testified, "After I checked his eyes, I could tell he wasn't intoxicated, so I warned him about driving with a container and littering, and reminded him to get his light fixed" after returning defendant's driver's license to him. The officer could not recall if he expressly told defendant that he was free to leave.[3]

Then, while the officer was preparing to return to his patrol car, defendant remained at the location where the earlier contact had occurred.[4] When asked about the lapse of time between his statements to defendant and the subsequent questions about drugs and weapons that the majority characterizes as a continuation of the traffic stop, the officer responded, "If I had to guess, probably ten to 15 seconds." The officer also testified,

"I was getting ready to walk back to my car, and he still stood there." But that's generally how I will end a traffic stop, and most people take that as an end—hand their license back, and tell them to get whatever it is fixed, or drive safe, or whatever the contact happened to be."

Thus, the appropriate legal inquiry is whether defendant's liberty of movement was interfered with based on the totality of the above circumstances. A person's freedom of movement can be restrained physically, orally, or by a

---

[2] An "HGN" or Horizontal Gaze Nystagmus test measures the "angle of onset of nystagmus, or jerky movement, as the eye tracks a steadily moving object, such as a finger, pencil, or pen-size flashlight." *State v. O'Key*, 321 Or 285, 287, 899 P2d 663 (1993). According to the record, the HGN test was the only field sobriety test that the officer administered.

[3] *See State v. Bretches*, 225 Or App 602, 202 P3d 883, *rev den*, 346 Or 361 (2009) (holding that where the defendant was told he was free to leave but continued to converse with the officer, his consent did not occur in the course of an illegal stop); *see also State v. Peppard*, 172 Or App 311, 18 P3d 488, *vac'd*, 332 Or 630, 34 P3d 168 (2001) (holding that no violation occurred under Article I, section 9, when an officer told the defendant he was free to leave after handing him traffic citations and then obtained a voluntary consent to search the vehicle); *State v. Arabzadeh*, 162 Or App 423, 986 P2d 736 (1999) (holding that an officer did not exploit any prior unlawful conduct in obtaining a consent to search from the passenger in a car that had been stopped for a traffic violation after telling the driver that he was free to leave).

[4] The majority asserts that "[t]he officer did not move to return to his patrol car." 230 Or App at 478. In fact, the officer's only testimony on that subject was "I was getting ready to walk back to my car, and he still stood there." Consequently, the record does not reveal whether the officer made any motions toward his patrol car.

combination of words and actions. However, in order to implicate Article I, section 9, the net effect of the officer's conduct must be coercive in nature in the sense that it manifests objectively an interference with the person's freedom of movement. *Amaya*, 336 Or at 627; *Holmes*, 311 Or at 407.

There is no evidence that the officer physically restrained defendant from returning to his vehicle. Indeed, the only actions of the officer toward defendant were verbal and not physical. In the abstract, some words spoken in the absence of physical actions are inherently capable of interfering with a person's liberty of movement: for example, a command by a police officer to "stay right where you are!" However, here, the officer's statements to defendant were the antithesis of continuing the traffic stop; the officer returned defendant's driver's license to him and verbally admonished him after performing the HGN test and deciding that he was not under the influence of alcohol. The officer's verbal statements about open containers, littering, and the repair of defendant's brake light by themselves simply do not manifest the continuation of an objectively reasonable interference with defendant's freedom of movement.

The other pertinent circumstance regarding whether the traffic stop had ended is the pause of 10 to 15 seconds that occurred after the above events and before the officer asked defendant about whether he had weapons or drugs in his car. In analyzing the legal import of that circumstance, the circumstances in *State v. Toevs* are instructive because they provide an illustration of when words combined with actions are deemed to constitute a coercive restraint on a person's freedom of movement. In *Toevs*, officers, after telling the defendant that he was free to leave, immediately asked the defendant if they could search his vehicle and continued asking for consent even though the defendant refused. One officer also asked the defendant if he possessed any drugs. The other officer intervened when it became apparent that the first officer was unable to persuade the defendant to give his consent to search, and he asked the defendant two more times if he had any drugs in the vehicle. The court concluded that under the totality of the circumstances, "the officer's continuous show of police authority constituted conduct that was 'significantly beyond that accepted in ordinary

social intercourse,'" *Toevs*, 327 Or at 536-37 (quoting *Holmes*, 311 Or at 410). Therefore, the court held that the officers had continued to detain the defendant after he had been told that he was free to leave. *Toevs*, 327 Or at 537.

Unlike in *Toevs*, where the officers *continuously* sought to persuade the defendant to consent to a search throughout the traffic stop, with defendant, the issue regarding drugs in this case arose only after it was evident that the traffic stop investigation was at end. Indeed, a reasonable person in defendant's circumstances would have understood that the traffic stop had been resolved with the return of defendant's driver's license to him and the officer's warnings that defendant acknowledged. Although 10 to 15 seconds is not a long period of time, it is long enough in the context of ordinary social intercourse when combined with the other circumstances in this case to objectively indicate that the traffic stop had ended. Under those circumstances, the period of silence when neither defendant nor the officer spoke after the officer had returned defendant's driver's license to him would have been a clear indication to a reasonable person that the traffic stop was over. It follows that the majority incorrectly concludes that the officer's words effectively continued the traffic stop rather than ending it.

For the above reasons, I would affirm defendant's conviction.

Brewer, C. J., and Landau and Wollheim, JJ., join in this dissent.